# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| IN RE: REALPAGE, RENTAL SOFTWARE ANTITRUST LITIGATION (NO. II) | Case No. 3:23-MD-3071<br><br>**This Document Relates to:**<br>**ALL CASES**<br><br>**Chief Judge Waverly D. Crenshaw, Jr**. |

## MEMORANDUM OF LAW IN SUPPORT OF THE STATEMENT OF INTEREST OF THE UNITED STATES

JONATHAN S. KANTER
*Assistant Attorney General*

DOHA G. MEKKI
*Principal Deputy Assistant Attorney General*

MAGGIE GOODLANDER
*Deputy Assistant Attorney General*

ANDREW J. FORMAN
*Deputy Assistant Attorney General*

DAVID B. LAWRENCE
*Policy Director*

JACOBUS VAN DER VEN
*Counsel to the Assistant Attorney General*

DANIEL E. HAAR
NICKOLAI G. LEVIN
STRATTON C. STRAND
YIXI (CECILIA) CHENG
*Attorneys*

U.S. Department of Justice
Antitrust Division
950 Pennsylvania Ave NW, #3224
Washington, DC 20530
Telephone: 202-705-8342
Email: yixi.cheng@usdoj.gov

*Counsel for the United States of America*

HENRY C. LEVENTIS
*United States Attorney*

MICHAEL C. TACKEFF, B.P.R. #036953
*Assistant United States Attorney*

Middle District of Tennessee
719 Church Street, Suite 3300
Nashville, TN 37203
Telephone: (615) 736-5151
Email: michael.tackeff@usdoj.gov

## Table of Contents

Page

TABLE OF AUTHORITIES ................................................................................................. ii

BACKGROUND ................................................................................................................1

ARGUMENT ....................................................................................................................4

   I.    **There Are Many Types of Concerted Action and Many Ways of Proving It** ..............5

       A.  Concerted Action Includes Any Type of Conduct That Joins
            Together Separate Decisionmakers and Thus Deprives the Marketplace of
            Independent Centers of Decisionmaking ........................................................5

       B.  Concerted Action Can Be Shown In Many Ways, Including An Invitation
            Followed By Conduct Showing Acceptance ..................................................8

       C.  The Complaints Allege Concerted Action ...................................................12

  II.   **The Per Se Rule Prohibiting Price Fixing Applies to Price Fixing
      Using Algorithms** ....................................................................................................15

       A.  Using an Algorithm to Fix Prices Among Actual or Potential Competitors Is
            Per Se Unlawful ...........................................................................................15

       B.  The Per Se Rule Applies to the Allegations in this Case ............................18

CONCLUSION ...............................................................................................................23

# Table of Authorities

Page(s)

**Cases**

*American Column & Lumber Co. v. United States,*
257 U.S. 377 (1921)................................................................................................ 21

*American Needle, Inc. v. NFL,*
560 U.S. 183 (2010)............................................... 1, 4, 5, 8, 12, 14, 15, 18

*American Tobacco Co. v. United States,*
328 U.S. 781 (1946)................................................................................................ 6

*Anderson v. Shipowners' of Pac. Coast,*
272 U.S. 359 (1926)................................................................................................ 6

*Arizona v. Maricopa County Medical Society,*
457 U.S. 332 (1982)................................................................................ 16, 17, 23

*Bell Atlantic Corp. v. Twombly,*
550 U.S. 544 (2007)................................................................................... 6, 12, 21

*Bourjaily v. United States,*
483 U.S. 171 (1987)................................................................................................ 9

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,*
509 U.S. 209 (1993)................................................................................................ 6

*Business Electronics Corp. v. Sharp Electronics Corp.,*
485 U.S. 717 (1988)............................................................................................... 16

*C.S. Sewell, M.D. P.C. v. Amerigroup Tennessee, Inc.,*
2018 WL 6591429 (M.D. Tenn. Dec. 14, 2018)........................................... 6, 8, 21

*Catalano, Inc. v. Target Sales, Inc.,*
446 U.S. 643 (1980)......................................................................................... 15, 17

*Citizen Publishing Co. v. United States,*
394 U.S. 131 (1969)......................................................................................... 19, 20

*Com-Tel, Inc. v. DuKane,*
669 F.2d 404 (6th Cir. 1982) ............................................................................... 19

*Continental Wall Paper Co. v. Lewis Voight & Sons Co.,*
212 U.S. 227 (1909)............................................................................................... 20

*Darby v. Childvine, Inc.,*
964 F.3d 440 (6th Cir. 2020) ................................................................................. 2

*Direct Sales Co. v. United States*,
    319 U.S. 703 (1943)................................................................................ 6

*E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*,
    365 U.S. 127 (1961)................................................................................ 7

*Epic Games, Inc. v. Apple, Inc.*,
    67 F.4th 946 (9th Cir. 2023) ................................................................ 12

*Erie County, Ohio v. Morton Salt, Inc.*,
    702 F.3d 860 (6th Cir. 2012) ................................................................ 6

*FTC v. Cement Institute*,
    333 U.S. 683 (1948).............................................................................. 10

*FTC v. Superior Court Trial Lawyers Ass'n*,
    493 U.S. 411 (1990).............................................................................. 17

*Gelboim v. Bank of America Corp.*,
    823 F.3d 759 (2d Cir. 2016)............................................................ 17, 20

*Glasser v. United States*,
    315 U.S. 60 (1942)............................................................................. 8, 9

*Goldfarb v. Virginia State Bar*,
    421 U.S. 773 (1975).............................................................................. 22

*Hyland v. HomeServices of America, Inc.*,
    771 F.3d 310 (6th Cir. 2014) ............................................................ 8, 14

*In re Flat Glass Antitrust Litigation*,
    385 F.3d 350 (3d Cir. 2004)............................................................ 20, 22

*In re High Fructose Corn Syrup Antitrust Litigation*,
    295 F.3d 651 (7th Cir. 2002) ................................................................ 21

*In re Insurance Brokerage Antitrust Litigation*,
    618 F.3d 300 (3d Cir. 2010)................................................................ 11

*In re Southeastern Milk Antitrust Litigation*,
    739 F.3d 262 (6th Cir. 2014) ................................................................ 16

*In re Travel Agent Commission Antitrust Litigation*,
    583 F.3d 896 (6th Cir. 2009) ................................................................ 10

*In re Vitamins Antitrust Litigation*,
    320 F. Supp. 2d 1 (D.D.C. 2004) .......................................................... 9

iii

*Interstate Circuit v. United States,*
    306 U.S. 208 (1939) ........................................................................... 7, 9, 11, 13, 21

*James R. Snyder Co. v. Associated General Contractors of America, Detroit Chapter, Inc.,*
    677 F.2d 1111 (6th Cir. 1982) ......................................................................... 10

*Kleen Products LLC v. Georgia-Pacific LLC,*
    910 F.3d 927 (7th Cir. 2018) ....................................................................... 6, 18

*Kleen Products, LLC v. Packaging Corp. of America,*
    775 F. Supp. 2d 1071 (N.D. Ill. 2011) ................................................................ 7

*Klor's Inc. v. Broadway-Hale Stores, Inc.,*
    359 U.S. 207 (1959) ................................................................................. 16, 19

*Lamb Enterprises, Inc. v. Toledo Blade Co.,*
    461 F.2d 506 (6th Cir. 1972) ........................................................................ 11

*Meyer v. Kalanick,*
    174 F. Supp. 3d 817 (S.D.N.Y. 2016) ............................................................ 12, 20

*NCAA v. Board of Regents of University of Oklahoma,*
    468 U.S. 85 (1984) ........................................................................ 1, 4, 5, 16, 17

*Norfolk Monument Co. v. Woodlawn Memorial Gardens,*
    394 U.S. 700 (1969) .................................................................................... 23

*Northern Securities Co. v. United States,*
    193 U.S. 197 (1904) ..................................................................................... 7

*Northern Pacific Railway Co. v. United States,*
    356 U.S. 1 (1958) ......................................................................................... 1

*Ohio v. American Express Co.,*
    138 S. Ct. 2274 (2018) .............................................................................. 16, 17

*Palmer v. BRG of Georgia, Inc.,*
    498 U.S. 46 (1980) ...................................................................................... 18

*PLS.Com, LLC v. National Ass'n of Realtors,*
    32 F.4th 824 (9th Cir. 2022) ......................................................................... 11

*Relevent Sports, LLC v. United States Soccer Federation, Inc.,*
    61 F.4th 299 (2d Cir. 2023) ............................................................... 6, 12, 13, 15

*Robertson v. Sea Pines Real Estate Cos., Inc.,*
    679 F.3d 278 (4th Cir. 2012) ........................................................................ 12

iv

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
 792 F.2d 210 (D.C. Cir. 1986) ........................................................................ 16, 18

*Standard Oil Co. of New Jersey v. United States*,
 221 U.S. 1 (1911) ................................................................................................... 15

*Systemcare, Inc. v. Wang Laboratories Corp.*,
 117 F.3d 1137 (10th Cir. 1997) .......................................................................... 12

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
 552 F.3d 430 (6th Cir. 2008) ............................................................................... 15

*Toys R Us, Inc. v. FTC*,
 221 F.3d 928 (7th Cir. 2000) ............................................................................... 11

*United States v. Airline Tariff Publishing Co.*,
 836 F. Supp. 9 (D.D.C. 1993) .............................................................................. 21

*United States v. All Star Industries*,
 962 F.2d 465 (5th Cir. 1992) ............................................................................... 19

*United States v. American Tobacco Co.*,
 221 U.S. 106 (1911) ................................................................................................. 7

*United States v. Andreas*,
 216 F.3d 645 (7th Cir. 2000) ............................................................................... 23

*United States v. Apple, Inc.*,
 791 F.3d 290 (2d Cir. 2015) ........................................................................... 11, 19

*United States v. Citizens & Southern National Bank*,
 422 U.S. 86 (1975) ................................................................................................. 20

*United States v. Foley*,
 598 F.2d 1323 (4th Cir. 1979) ............................................................................. 11

*United States v. Frazier*,
 584 F.2d 790 (6th Cir. 1978) ................................................................................. 9

*United States v. General Motors Corp.*,
 384 U.S. 127 (1966) ............................................................................................... 19

*United States v. Jackson*,
 422 F.2d 975 (6th Cir. 1970) ................................................................................. 7

*United States v. Maliszewski*,
 161 F.3d 992 (6th Cir. 1998) ................................................................................. 6

*United States v. Masonite Corp.*,
  316 U.S. 265 (1942) ............................................................................................ 10, 20

*United States v. McKesson & Robbins, Inc.*,
  351 U.S. 305 (1956) ................................................................................................... 17

*United States v. MMR Corp. (LA)*,
  907 F.2d 489 (5th Cir. 1990) .................................................................................... 19

*United States v. Moody*,
  787 F. App'x 857 (6th Cir. 2019) ....................................................................... 11, 21

*United States v. Paramount Pictures, Inc.*,
  334 U.S. 131 (1948) ................................................................................................... 10

*United States v. Socony-Vacuum Oil Co.*,
  310 U.S. 150 (1940) ............................................................... 1, 6, 17, 18, 19, 22

*United States v. Topkins*,
  No. CR 15-00201 (N.D. Cal. Apr. 30, 2015), https://www.justice.gov/atr/case-
  document/file/628891/download ............................................................................ 18

*United States v. Union Pacific Railroad Co.*,
  226 U.S. 61 (1912) ....................................................................................................... 2

*Verizon Commcunications Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) ................................................................................................... 15

*Virginia Excelsior Mills, Inc v. FTC*,
  256 F.2d 538 (4th Cir. 1958) .................................................................................... 20

*White v. R.M. Packer Co.*,
  635 F.3d 571 (1st Cir. 2011) ...................................................................................... 6

**Statutes**

15 U.S.C. § 1 ................................................................................................ 1, 4, 5, 7, 15

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ....................................................................... 8

**Other Authorities**

Salil K. Mehra, *Price Discrimination-Driven Algorithmic Collusion: Platforms for Durable
  Cartels*, 26 STAN. J. L. & BUS. FIN. 171 (2021) ..................................................... 2

Maureen K. Ohlhausen, *Should We Fear The Things That Go Beep In the Night? Some Initial
  Thoughts on the Intersection of Antitrust Law and Algorithmic Pricing*, Federal Trade

Commission (May 23, 2017),
https://www.ftc.gov/system/files/documents/public_statements/1220893/ohlhausen_-
_concurrences_5-23-17.pdf ................................................................. 21

Richard Posner, *Antitrust in the New Economy*, 68 ANTITRUST L.J. 925 (2001) .......................... 2

The United States respectfully submits this memorandum of law in support of its Statement of Interest.

## BACKGROUND

**1.** Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy" that unreasonably restrains trade. 15 U.S.C. § 1; *NCAA v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 98 (1984). As the Supreme Court has reaffirmed, "[t]he Sherman Act was designed to be a comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958).

Given this purpose, the "central evil" addressed by Section 1 of the Sherman Act is "the elimination of competition that would otherwise exist," including competition on prices. *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 195 (2010) (citation omitted); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940). It is per se illegal for competitors to join together their independent decision-making power to raise, depress, fix, peg, or stabilize prices. *See Socony-Vacuum*, 310 U.S. at 223-24 & n.59.

As technology has evolved, so too have methods of price fixing. In 1890, a price-fixing conspiracy might have manifested with a formal handshake in a clandestine meeting. The proliferation of fax machines, emails, text messages, and inter-company chat platforms has presented new means of unlawfully acting in concert oceans away. While these methods might have been unimaginable to the robber barons whose conduct necessitated and inspired the Sherman Act, under Section 1, "the machinery employed by a combination for price-fixing is immaterial." *Socony-Vacuum*, 310 U.S. at 223. Section 1 applies to collaborations that eliminate independent decisionmaking—however they have been brought about. *See Am. Needle*, 560 U.S. at 186, 195;

1

pp. 5-8, *infra*. Antitrust law does not become obsolete simply because conspirators find new ways to act in concert. As the Supreme Court has recognized, the Sherman Act was written to "embrace[] all forms of combination, *old and new*." *United States v. Union Pac. R. Co.*, 226 U.S. 61, 85-86 (1912) (emphasis added); *cf.* Richard Posner, *Antitrust in the New Economy*, 68 ANTITRUST L.J. 925, 925 (2001) ("[A]ntitrust doctrine is supple enough . . . to take in stride the competitive issues presented by the new economy.").

Today, software algorithms can be employed to fix prices—and this modern machinery may be easier and more effective than past methods of price fixing. Algorithms can process far more information more rapidly than humans. The technical capabilities of software can enhance competitors' ability to optimize cartel gains, monitor real-time deviations, and minimize incentives to cheat. *See, e.g.*, Salil K. Mehra, *Price Discrimination-Driven Algorithmic Collusion: Platforms for Durable Cartels*, 26 STAN. J. L. & BUS. FIN. 171, 177 (2021).

Longstanding legal principles apply with equal force to this new machinery. Section 1 prohibits competitors from fixing prices by knowingly sharing their competitive information with, and then relying on pricing decisions from, a common *human* pricing agent who competitors know analyzes information from multiple competitors. The same prohibition applies where, as here, the common pricing agent is a common software algorithm.

**2.** This case involves two complaints alleging unlawful price-fixing schemes among landlords[1] organized by a software algorithm company: RealPage.[2] One complaint alleges an unlawful agreement to use RealPage software recommendations to "raise multifamily rental

---

[1] "Landlords" in this memorandum refers to all defendants named in the complaints, save RealPage, Inc. and its private-equity owners.

[2] All facts in this memorandum are based on the complaints. Factual allegations are "taken as true" as true on a motion to dismiss. *Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020).

2

housing prices." Doc. No. 530 ("Multifamily Compl."), ¶¶ 1, 5-6. The second alleges a similar scheme to "artificially inflate the prices of student housing." Doc. No. 527 ("Student Compl."), ¶¶ 1, 6.[3]

RealPage, the complaints allege, unlawfully combines competing landlords' decisionmaking on housing prices. To participate in the service, landlords must share in "real-time" their "non-public," "competitively sensitive" data, including actual rents paid, occupancy rates, and records of lease transactions. Multifamily Compl. ¶¶ 227, 380. RealPage then feeds "this data into a common algorithm." Student Compl. ¶ 5; Multifamily Compl. ¶ 380. The common algorithm uses these common data for a single, common purpose: to generate "forward-looking, unit-specific pricing and supply recommendations" for all participating landlords. Student Compl. ¶ 5. To ensure that the landlords abide by these "recommendations," RealPage puts significant "pressure" on them "to implement RealPage's prices," including by requiring clients to submit requests to deviate to the "corporate office" and tracking the "identity of the client's staff that requested a deviation." Multifamily Compl. ¶¶ 17-20, 261-86. As a result, landlords using RealPage adopt RealPage's recommendations 80-90% of the time. *Id.* ¶ 15.

The complaints allege that RealPage was clear about the purpose of its common pricing scheme: to increase prices above competitive levels through collaboration. According to the complaints, RealPage's own marketing materials make clear that it "utilizes the competitive data" of competitors, Student Compl. ¶ 5, to allow those competitors to "outperform the market," Multifamily Compl. ¶ 4; Student Compl. ¶¶ 15, 142. As RealPage allegedly put it, it offered clients "the ability to 'outsource daily pricing and ongoing revenue oversight' to RealPage," allowing

---

[3] This memorandum addresses only plaintiffs' claim that the alleged scheme is per se unlawful. It does not address plaintiffs' alternate, rule-of-reason claim or the student plaintiffs' claim alleging a conspiracy to exchange competitively sensitive information.

3

RealPage to "set prices for its clients' properties 'as though we [RealPage] own[ed] them ourselves.'" Multifamily Compl. ¶ 7. Collaboration on prices, including via sharing nonpublic pricing and supply information, is thus the central feature of the product. As an employee for one landlord stated: While "we are all technically competitors, [RealPage product] helps us to work together . . . to make us *all* more successful in our pricing," as the software is "designed to work with a community in pricing strategies, *not work separately*." *Id*. ¶ 9 (emphases added); *accord* Student Compl. ¶¶ 4, 6. Put simply, RealPage allegedly replaces independent competitive decisionmaking on prices, which often leads to lower prices for tenants, with a price-fixing combination that violates Section 1 of the Sherman Act.

Defendants have moved to dismiss both complaints, claiming that plaintiffs failed to adequately allege a Section 1 violation. Doc. No. 593 ("Multifamily Mot."); Doc No. 588 ("Student Mot.").

## ARGUMENT

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy" that unreasonably restrains trade. 15 U.S.C. § 1; *Bd. of Regents*, 468 U.S. at 98. The Supreme Court has identified two central elements under Section 1: (1) a "contract, combination, or conspiracy"—that is, "concerted action," the joining together of "independent centers of decisionmaking"; and (2) that "unreasonably restrains trade." *Am. Needle*, 560 U.S. at 186, 195. Each element poses a separate inquiry. The "question whether an arrangement is a contract, combination, or conspiracy is different from and antecedent to the question whether it unreasonably restrains trade." *Id* at 186.

This memorandum addresses each element in turn. As to the first, it explains that concerted action includes any conduct that joins together otherwise-separate decisionmaking and thus deprives the market of independent centers of decisionmaking. As to the second, it explains

4

that certain classes of conduct—including price-fixing arrangements among actual or potential competitors—are categorically unreasonable restraints of trade that violate Section 1 of the Sherman Act.

## I.     There Are Many Types of Concerted Action and Many Ways of Proving It

In this section, we first address the proper scope of Section 1's concerted-action requirement before explaining the range of evidence capable of satisfying it. We conclude by applying the law to the allegations set forth in the complaints.

### A.  Concerted Action Includes Any Type of Conduct That Joins Together Separate Decisionmakers and Thus Deprives the Marketplace of Independent Centers of Decisionmaking

As the Supreme Court has made clear, "Section 1 applies only to concerted action that restrains trade." *Am. Needle*, 560 U.S. at 190. Because Congress recognized that "[c]oncerted activity inherently is fraught with anticompetitive risk," it defined concerted action broadly to encompass contracts, combinations, and conspiracies. *Id.* at 190, 195 (citation omitted). The "key" to the concerted-action inquiry is whether the alleged arrangement "joins together separate decisionmakers" and thus "deprives the marketplace of independent centers of decisionmaking." *Id.* at 195 (citations omitted). It is a "functional analysis" that focuses on "how the parties involved in the alleged anticompetitive conduct actually operate." *Id.* at 191-92, 195; *see also id.* at 196 (reaffirming that "the inquiry is one of competitive reality").

Given the Sherman Act's focus on protecting independent decisionmaking, courts recognize that the joint delegation of competitive decisions constitutes concerted action under Section 1. For example, the Supreme Court has held that "decisions by [a joint licensing agent] regarding the [NFL] teams' separately owned intellectual property constitute concerted action" by the teams. *Am. Needle*, 560 U.S. at 204 (citation omitted). And the Second Circuit has concluded that allegations that competing entities "have 'surrendered [their] freedom of action . . . and agreed

5

to abide by the will of the association[]'" are "enough" for concerted action.  *Relevent Sports, LLC v. United States Soccer Fed'n, Inc*., 61 F.4th 299, 309 (2d Cir. 2023) (citing *Anderson v. Shipowners' Ass'n of Pac. Coast*, 272 U.S. 359, 364-65 (1926)).  In these situations, the common delegation of decisionmaking to a common entity allows its decisions to affect actual or potential competition—even without any additional subsequent agreement or coordination among the parties.  This kind of delegation thus represents the joining together of separate actors with separate economic interests characteristic of concerted action that Section 1 of the Sherman Act reaches.

Even when courts look for an "agreement" among separate entities in analyzing concerted action, "[n]o formal agreement is necessary" under Section 1.  *Am. Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946). "[T]acit" agreements qualify.[4]  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007) (citation omitted); *Erie Cnty., Ohio v. Morton Salt, Inc.*, 702 F.3d 860, 868 (6th Cir. 2012); *C.S. Sewell, M.D. P.C. v. Amerigroup Tennessee, Inc.*, 2018 WL 6591429, at *3 (M.D. Tenn. Dec. 14, 2018) (Crenshaw, J.).  Such tacit agreements can involve merely a "wink and a nod," *Kleen Prod. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 936 (7th Cir. 2018), or be an informal "gentlemen's agreement or understanding," *Socony-Vacuum.*, 310 U.S. at 179, 252; in these circumstances, "only the conspirators' actions . . . indicate the existence of an agreement."  *White v. R.M. Packer Co.*, 635 F.3d 571, 575-76 (1st Cir. 2011).[5]

---

[4] A "tacit agreement," which is concerted action, *Twombly*, 550 U.S. at 553, is different from mere interdependent action by firms in oligopolistic markets, which is sometimes called "tacit collusion" and is not concerted action.  *See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993).

[5] *See also Direct Sales Co. v. United States*, 319 U.S. 703, 714 (1943) ("it can make no difference [that] the agreement was a tacit understanding, created by a long course of conduct and executed in the same way"); *United States v. Maliszewski*, 161 F.3d 992, 1006 (6th Cir. 1998) ("evidence of a tacit agreement or mutual understanding is sufficient to demonstrate a conspiracy").

That breadth of Section 1's reach rests in part on the fact that, by its own statutory terms, the provision covers "combination[s]" in addition to "contract[s]" and "conspirac[ies]." 15 U.S.C. § 1. The statutory term "combination" has been interpreted to cover actions in concert where the challenged conduct inherently involves cooperative behavior, such as when holding companies join together the operation of previously competing companies. *See*, *e.g.*, *United States v. Am. Tobacco Co.*, 221 U.S. 106, 187 (1911); *N. Sec. Co. v. United States*, 193 U.S. 197, 326-27 (1904). And a "combination" exists when there is an implied (or express) "understanding that the participants will jointly give up their trade freedom." *E. R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136-37 (1961).

Importantly, establishing concerted action under Section 1 does not require any showing of *simultaneous* action—or even action that is close in time. It is "elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators." *Interstate Circuit v. United States*, 306 U.S. 208, 227 (1939). An agreement therefore "need not be entered into by all the parties at the same time" and "may be reached by successive actions evidencing their joining of [a] conspiracy." *United States v. Jackson*, 422 F.2d 975, 978 (6th Cir. 1970); *see also Kleen Prod., LLC v. Packaging Corp. of Am.*, 775 F. Supp. 2d 1071, 1077 (N.D. Ill. 2011) (collecting cases).

For these reasons, defendants' motions to dismiss are based on an overly narrow view of concerted action. Defendants seek to limit the scope of Section 1 to a narrow category of conspiracy: that in which individuals enter a formal agreement to engage in the same conduct at the same time. *See* Multifamily Mot. 9-11; Student Mot. 8-9. But concerted action is not so limited. As explained above, competitors act in concert when their conduct "joins together separate decisionmakers," thereby "depriv[ing] the marketplace of independent centers of

7

decisionmaking." *Am. Needle*, 560 U.S. at 195 (citations omitted). This deprivation of independent centers of decisionmaking can occur through delegation to a common entity or through tacit agreement, and it does not require simultaneous action.

### B. Concerted Action Can Be Shown In Many Ways, Including An Invitation Followed By Conduct Showing Acceptance

Concerted action can be shown through circumstantial or direct evidence. *Hyland v. HomeServices of Am., Inc.*, 771 F.3d 310, 318-20 (6th Cir. 2014); *C.S. Sewell*, 2018 WL 6591429, at *3. But, just as there are many types of concerted action, there are many ways of proving it through either avenue.

**1.** Start with circumstantial evidence. Defendants' motions focus narrowly on only one type of circumstantial evidence: parallel conduct and plus factors. Multifamily Mot. 13-23; Student Mot. 11-20. This method of proof makes sense in some circumstances, including where plaintiffs seek to infer a secret conspiracy from parallel conduct, such as multiple competitors' setting or changing their prices at the same time. *See, e.g.*, *Hyland*, 771 F.3d at 318. In those instances, courts often look to "plus factors" to gauge whether there is sufficient circumstantial evidence to infer that the parallel conduct stems from concerted action instead of independent action.

But that is not the only way to prove concerted action circumstantially. As this Court has explained, the core question on a Rule 12(b)(6) motion is whether there are allegations that "raise[] an inference of coordination" and "negate[] the likelihood of independent action." *C.S. Sewell*, 2018 WL 6591429, at *3. In some situations, the evidence may disclose cooperative conduct among the defendants—such that a "combination" of competitors joining together their decisionmaking can be inferred from their cooperative actions. As the Supreme Court has held, "a common purpose and plan may be inferred from a development and collocation of

8

circumstances." *Glasser v. United States*, 315 U.S. 60, 80 (1942) (internal quotation marks omitted), *superseded on other grounds as recognized by Bourjaily v. United States*, 483 U.S. 171, 181 (1987); *United States v. Frazier*, 584 F.2d 790, 796 (6th Cir. 1978) (same); *In re Vitamins Antitrust Litig.*, 320 F. Supp. 2d 1, 16 (D.D.C. 2004) (same).

In particular, as the Supreme Court held in *Interstate Circuit v. United States*, an invitation proposing collective action followed by a course of conduct showing acceptance suffices to show concerted action: "[A]cceptance by competitors, *without previous agreement*, of an invitation to participate in a plan . . . is sufficient to establish an unlawful conspiracy under the Sherman Act." 306 U.S. at 227 (emphasis added). In *Interstate Circuit*, a manager of two movie theater companies sent identical letters to eight major national film distributors—mentioning in the letter that the same letter was being sent to all of them. The letter asked the distributors to impose certain restrictions on secondary runs of certain films. The distributors responded by imposing the restrictions. Although the Court first inferred an express agreement relying on considerations commonly used as part of the plus-factors framework today, it emphasized that such an express agreement was "*not* a prerequisite to [finding] an unlawful conspiracy." 306 U.S. at 226 (emphasis added).

Rather, the Court discussed how there was an alternative way of inferring that the defendants acted in concert under Section 1. This approach was distinct from the modern-day plus-factors analysis. Instead of looking to the sort of factors that would be termed "plus factors" today, the Court focused on the *nature* of the invitation (*i.e.*, whether it contemplates concerted action) and competitors' responsive actions demonstrating acceptance of the invitation: "It was enough that, knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it." *Id.* at 226-27. In particular, the Court

9

explained that "[e]ach distributor was advised that the others were asked to participate" and that "each knew that cooperation was essential to successful operation of the plan." *Id.* These circumstances, the Court held, showed concerted action even without "a previous [express] agreement." *Id.* at 227; *see also FTC v. Cement Inst.*, 333 U.S. 683, 716 n.17 (1948) (explaining that it is sufficient "if there is evidence that persons, with knowledge that concerted action was contemplated and invited, give adherence to and then participate in a scheme").

The Supreme Court applied this same approach in *United States v. Masonite Corp.*, 316 U.S. 265, 274-76 (1942). It held that the "circumstances surrounding the making of [bilateral settlement contracts]," including that each competitor was "aware" that "its contract was not an isolated transaction but part of a larger arrangement," left "no room for doubt that all had an awareness of the general scope and purpose of the undertaking" sufficient to establish a broader, single conspiracy. *Id.* Put simply, "[i]t is enough that a concert of action is contemplated and that the defendants conformed to the arrangement." *United States v. Paramount Pictures, Inc*., 334 U.S. 131, 142 (1948).

Lower courts have frequently recognized this method for showing concerted action as a viable path. This Circuit, for instance, has applied *Interstate Circuit*'s holding that competitors' acceptance, through conduct, of an invitation to act together suffices to establish concerted action. *See In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 906-07 (6th Cir. 2009) (considering whether plaintiffs alleged an antitrust conspiracy sufficiently similar to that in *Interstate Circuit*); *James R. Snyder Co. v. Assoc. Gen. Contractors of Am., Detroit Chapter, Inc.,* 677 F.2d 1111, 1121-22 (6th Cir. 1982) (quoting *Interstate Circuit* to explain that "[a]cceptance by competitors, without previous agreement, of an invitation to participate in a plan, the necessary consequence of which, if carried out, is restraint of interstate commerce, is sufficient to establish an unlawful

10

conspiracy under the Sherman Act"); *United States v. Moody*, 787 F. App'x 857, 870 (6th Cir.

2019) (unpublished) (describing a "classic hub-and-spoke conspiracy" as one where "concerted

action was contemplated and invited," and where each participant "knew that cooperation was

essential") (quoting *Interstate Circuit*); *cf. Lamb Enterprises, Inc. v. Toledo Blade Co.*, 461 F.2d

506, 516 (6th Cir. 1972) (upholding jury instruction in antitrust case that a conspiracy exists if

there is "concert of action between [the defendants]").  And federal courts of appeals have

repeatedly done the same, including in analogous cases.[6]

   *Meyer v. Kalanick*, 174 F. Supp. 3d 817 (S.D.N.Y. 2016), is particularly instructive.  The

district court considered whether Uber, a transportation mobile app, organized a conspiracy among

independent drivers to use Uber's pricing algorithm in setting fares for riders.  The court relied on

*Interstate Circuit* to hold that plaintiffs plausibly alleged a conspiracy in which drivers "sign[ed]

up for Uber precisely 'on the understanding that the other [drivers] were agreeing to the same'

pricing algorithm." *Id*. at 824.[7]  The court remarked, *id.* at 825:

---

[6] *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 331-32 (3d Cir. 2010) (considering
whether, under *Interstate Circuit*, defendants' decisions "presuppose concerted action");
*PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 843 (9th Cir. 2022) ("All that PLS must
allege is that [the defendant] adhered to a common scheme.") (citing *Interstate Circuit*, 306 U.S.
at 227); *Toys R Us, Inc. v. FTC*, 221 F.3d 928, 935-36 (7th Cir. 2000) (citing *Interstate Circuit* and
inferring agreement among competitors in part "from the nature of the proposals [made by an
intermediary], from the manner in which they were made," and "from the substantial unanimity of
action taken"); *United States v. Foley*, 598 F.2d 1323, 1331-32 (4th Cir. 1979) (citing *Interstate
Circuit* and upholding price-fixing convictions where competitors raised prices after a host
announced to his competitor guests that, though he "did not care what the others did," he planned
to increase prices)*; cf. United States v. Apple, Inc.*, 791 F.3d 290, 316 (2d Cir. 2015) ("Apple
understood that its proposed Contracts were attractive to the Publisher Defendants *only* if they
collectively shifted their relationships with Amazon to an agency model—which Apple knew
would result in higher consumer-facing ebook prices.").

[7] The court in *Meyer* also considered allegations that "drivers' agreements with Uber would 'be
against their own interests were they acting independently.'"  *Meyer*, 174 F. Supp. 3d at 824.
Although showing that actual or potential competitors acted against their self-interest can be
helpful in distinguishing whether conduct results from agreement or independent action, it is not

---

11

It is fundamental to the law of conspiracy that the agreements that form the essence of the misconduct are not to be judged by technical niceties but by practical realities. Sophisticated conspirators often reach their agreements as much by the wink and the nod as by explicit agreement, and the implicit agreement may be far more potent, and sinister, just by virtue of being implicit.

**2.**  There are similarly many types of direct evidence.  What constitutes such evidence can depend on the conduct being challenged.  For instance, in a case challenging a contractual term, the contract itself is direct evidence of concerted action.  *See Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 982 & n.13 (9th Cir. 2023); *Systemcare, Inc. v. Wang Labs. Corp.*, 117 F.3d 1137, 1143 (10th Cir. 1997).  And in a case challenging association rules governing members' separate businesses, the rules themselves are direct evidence of concerted action.  *See Relevent*, 61 F.4th at 303; *Robertson v. Sea Pines Real Estate Cos., Inc.*, 679 F.3d 278, 289 (4th Cir. 2012).  In each of these examples, no more is necessary to prove concerted action under Section 1.

Contrary to defendants' assertion, Multifamily Mot. 13; Student Mot. 11, direct evidence of *concerted action* need not be tantamount to an acknowledgement of guilt.  The concerted-action element is separate from the unreasonable-restraint element.  *See Am. Needle*, 560 U.S. at 186.  Indeed, as *American Needle* makes clear, even a procompetitive agreement that does not violate Section 1 still satisfies the concerted-action element.  *Id.* at 202-03.

### C.  The Complaints Allege Concerted Action

To survive a motion to dismiss, the allegations of concerted action must be "plausible" on "the assumption that all the [factual] allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555-56.  A "conclusory allegation of agreement" is not enough; some "factual enhancement" is needed to raise the plaintiff's entitlement to relief from "possible" to

_____

*necessary* for establishing agreement where a proposal contemplates concerted action (which naturally tends to rule out independent action).

12

"plausible." *Id.* at 556-57. The complaints allege numerous facts plausibly suggesting several related ways in which the landlords acted in concert.

Factual allegations in both complaints point to evidence of an invitation to act in concert followed by acceptance—evidence that is sufficient to plead concerted action under *Interstate Circuit*. *See* Multifamily Compl. ¶ 8 (citing *Interstate Circuit*); Student Compl. ¶¶ 4-8. Namely, it is "enough" that the landlords, "knowing that concerted action was contemplated and invited," adhered "to the scheme and participated in it." *Interstate Circuit*, 306 U.S. at 226-27.

To begin, the complaints allege that RealPage's proposal "contemplated" and "invited" concerted action among the landlords. In fact, its "intent to create coordination among users," including its "aim" of "increasing revenues by raising rents," was "transparent to all." Multifamily Compl. ¶ 4. Among other things, RealPage required each user to submit real-time pricing and supply data to it, and RealPage's marketing materials allegedly "touted" its use of "non-public data from other RealPage clients," enabling them to "raise rents in concert"; as well as the algorithms' ability to "facilitate collaboration among operations" and "track your competition's rent with precision." Multifamily Compl. ¶¶ 4, 6-9, 212, 292; Student Compl. ¶¶ 4, 6, 9.

The complaints then allege that the landlords "gave their adherence to the scheme and participated in it," *Interstate Circuit*, 306 U.S. at 226-27. In particular, according to the complaints, the landlords allegedly sent RealPage the non-public and competitively sensitive data (as RealPage proposed), Multifamily Compl. ¶¶ 227, 380; Student Compl. ¶¶ 5, 67, and overwhelmingly priced their units in line with RealPage's suggested prices (80-90%), Multifamily Compl. ¶ 10, 15, 241, 262; Student Compl. ¶¶ 6-9. Indeed, the complaints also contain ample allegations on how RealPage directly constrained the "deviations" from its suggested prices, including by enforcing and monitoring compliance with those prices, so the landlords effectively

13

delegated aspects of their pricing decisions to RealPage. Multifamily Compl. ¶¶ 6, 17-20, 255-86; Student Compl. ¶¶ 6-7, 84-93.[8]

Relatedly, the multifamily plaintiffs allege that the landlords jointly delegated aspects of decisionmaking on prices to RealPage. They allege that, by using RealPage's pricing algorithms, each client defendant "agreed" to a common plan that involved "delegat[ing] their rental price and supply decisions to a common decision maker, RealPage." Multifamily Compl. ¶ 6. Indeed, RealPage allegedly touted this feature—stating in a press release that it gives clients "the ability to 'outsource daily pricing and ongoing revenue oversight,'" such that RealPage could "set prices" as though it "own[ed]" the clients' properties "ourselves.'" Multifamily Compl. ¶ 7. Jointly delegating any part of the decision-making process reflects concerted action. *See* p. 5-8, *supra*. That the delegation is to a software algorithm, rather than a human, makes no difference to the legal analysis. Just as "surrender[ing] freedom of action. . . and agree[ing] to abide by the will of the association" can be enough for concerted action, *Relevent*, 61 F.4th at 309, so can be relying on a joint algorithm that generates prices based on shared competitively sensitive data. The actions of the joint agent can "constitute concerted action" by the participants. *Am. Needle*, 560 U.S. at 200, 204. And if evidence of this delegation exists that requires "no inferences to establish the proposition . . . being asserted," then there exists direct evidence of concerted action. *Hyland*, 771 F.3d at 318.

---

[8] Plaintiffs also alleged parallel conduct and plus factors seeking to raise an inference of an express agreement among the competing landlords. *See, e.g.*, Multifamily Compl. ¶¶ 366-89; Student Compl. ¶¶ 118-140. But, as discussed at pp. 8-14, such allegations are not necessary to state a Section 1 claim, and we take no position on them.

14

## II. The Per Se Rule Prohibiting Price Fixing Applies to Price Fixing Using Algorithms

If concerted action has been established under Section 1, courts ask next whether those actions in concert "unreasonably restrain[] trade." *Am. Needle*, 560 U.S. at 186. But for certain classes of conduct, no specialized inquiry is necessary—they are per se unlawful. Price fixing, one of the "supreme evil[s]" of antitrust, is the prototypical example of per se unlawful conduct. He *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004); *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980) (describing horizontal price fixing as the "archetypal" per se violation). The analysis is no different simply because a software algorithm is involved.

Taking the allegations set forth in the complaints as true, the alleged scheme meets the legal criteria for per se unlawful price fixing. Although not every use of an algorithm to set price qualifies as a per se violation of Section 1 of the Sherman Act, it is per se unlawful when, as alleged here, competitors knowingly combine their sensitive, nonpublic pricing and supply information in an algorithm that they rely upon in making pricing decisions, with the knowledge and expectation that other competitors will do the same.

### A. Using an Algorithm to Fix Prices Among Actual or Potential Competitors Is Per Se Unlawful

Courts analyze whether concerted action is anticompetitive, and thus unreasonable, in one of two ways: under (1) the per se rule or (2) the rule of reason. *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2283 (2018) ("*Amex*"); *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 434 (6th Cir. 2008). The per se rule condemns certain categories of restraints as unreasonable based on their inherently anticompetitive "nature and character." *Standard Oil Co. of New Jersey v. United States*, 221 U.S. 1, 64-65 (1911). The rule of reason requires a "fact-specific assessment" of the restraint's effect on competition. *Amex*, 138 S. Ct. at 2284.

Which rule applies typically depends on the answers to two questions. First, is the restraint "horizontal" or "vertical"? Because horizontal restraints join together actual or potential competitors, they pose a heightened risk of harm to the competitive process and "are generally less defensible" than vertical restraints. *Arizona v. Maricopa County Med. Soc'y*, 457 U.S. 332, 348 n.18 (1982). Typically, only horizontal restraints are per se unlawful. *Amex*, 138 S. Ct. at 2283-84. Second, if the concerted action is horizontal, does the restraint fall within one of the "classes of restraints which from their nature or character were unduly restrictive, and hence forbidden by both the common law and the statute," *Klor's, Inc. v. Broadway-Hale Stores, Inc*., 359 U.S. 207, 211 (1959)? If so, the restraint is per se unlawful, whatever its form.

**1.** Horizontal restraints are those that "eliminate some degree of rivalry" among "actual or potential competitors." *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 229 (D.C. Cir. 1986); *see also Bd. of Regents*, 468 U.S. at 99 (defining "horizontal restraint" as "an agreement among competitors on the way in which they will compete with one another"); *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988) ("Restraints imposed by agreement between competitors have traditionally been denominated as horizontal restraints[.]"); *In re SE Milk Antitrust Litig*., 739 F.3d 262, 272 (6th Cir. 2014) ("An agreement 'between competitors at the same level of the market structure' is horizontal."). For example, in *Board of Regents*, the Supreme Court held that NCAA member institutions created a "horizontal restraint" by "participating in an association which prevents [them] from competing against each other on the basis of price or kind of television rights that can be offered to broadcasters." 468 U.S. at 99. On the other hand, when "firms at different levels of distribution" agree on matters over which they do not compete—such as a manufacturer setting the terms for the distribution or sale of its *own* products—those restraints are "vertical." *Bus. Elecs.*, 485 U.S. at 730.

16

**2.**   Horizontal price fixing is a prototypical class of restraint that is per se unlawful. *FTC v. Superior Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 434 (1990); *Socony-Vacuum*, 310 U.S. at 218, 224 n.59 (stating that horizontal price fixing is "consistently and without deviation" held per se unlawful); *Catalano*, 446 U.S. at 647.   That remains true regardless of its particular form: "Whatever may be its peculiar problems and characteristics, the Sherman Act, so far as price-fixing agreements are concerned, establishes one uniform rule applicable to all industries alike." *Socony-Vacuum*, 310 U.S. at 221-22; *Maricopa*, 457 U.S. at 346.[9]

Per se unlawful price fixing includes not only competitors' acting in concert to set the same price at which a product is bought or sold.   It also includes any "combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity." *Socony-Vacuum*, 310 U.S. at 223; *see Maricopa*, 457 U.S. at 339, 348; *United States v. McKesson & Robbins, Inc.*, 351 U.S. 305, 309-10 (1956).   Under this well-established standard, the Supreme Court and courts of appeals have declared per se unlawful numerous types of price-fixing arrangements, including concerted action on price components, formulas, or discounts. *E.g.*, *Socony-Vacuum*, 310 U.S. at 222 (explaining that setting formulas is per se unlawful); *Catalano*, 446 U.S. at 648 (same for eliminating discounts); *Maricopa*, 457 U.S. at 339 (same for establishing maximum fee schedules); *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 771 (2d Cir. 2016) (same for fixing LIBOR interest rate—"a component of the return from various LIBOR-denominated financial instruments").   Particularly relevant here, the Supreme Court has long condemned as per se unlawful agreements to use the same "formula underlying price policies," *Socony-Vacuum*, 310 U.S. at 224-226 n.59, which includes use of the same pricing algorithm. *See* Plea Agreement,

---

[9] Defendants can avoid per se liability by raising and establishing an ancillary-restraints defense, but defendants have not raised such a defense here.

*United States v. Topkins*, No. CR 15-00201 (N.D. Cal. Apr. 30, 2015),

https://www.justice.gov/atr/case-document/file/628891/download, at ¶ 4(b) (conspirators'

"agree[ing] to adopt specific pricing algorithms"). Courts have also recognized that price fixing

can be accomplished through means other than merely agreeing to the final price—such as revenue

sharing, *Palmer v. BRG of Ga., Inc.*, 498 U.S. 46, 49 (1980), and restricting output, *e.g.*, *Socony-

Vacuum*, 310 U.S. at 223 (holding unlawful price fixing via purchasing surplus gasoline); *Kleen*,

910 F.3d at 937 (same via jointly restricting supply).

**B.  The Per Se Rule Applies to the Allegations in this Case**

Taking the complaints' allegations as true, the alleged scheme is (1) horizontal (2) price

fixing.

**1.**   The alleged scheme is horizontal because it "eliminate[s] some degree of rivalry

between persons or firms who are actual or potential competitors," *Rothery*, 792 F.2d at 229—

namely, the competing landlords that have allegedly agreed to use RealPage's pricing algorithm

and follow its recommendations. *See* pp. 2-4, 13-14, *supra*.

Defendants object to per se treatment in part because they view the challenged concerted

action as "*vertical* in nature," presumably because RealPage and the landlords are not competitors.

Multifamily Mot. 28; Student Mot. 23. Because RealPage is not a supplier or distributor of housing

units, it is unclear if the "vertical" label properly characterizes its relationship with the landlords.

But, even if it does, RealPage's participation in the conspiracy does not vitiate per se treatment;

competitors "cannot simply get around antitrust liability by acting through a third-party

intermediary." *Am. Needle*, 560 U.S. at 202 (cleaned up). The key feature of the alleged scheme

is that it eliminates separate pricing decisions by competing landlords—thus establishing a

horizontal arrangement.

18

Courts have repeatedly found horizontal conspiracies to be per se unlawful even if a vertically related entity is involved. In *United States v. General Motors Corp.*, for instance, the Supreme Court had "no doubt" that a collaboration among horizontal distributors was "a per se violation of the [Sherman] Act," even though a vertically related party (General Motors) was involved in the boycott. 384 U.S. 127, 145 (1966); *see also Klor*'s, 359 U.S. at 209 (similar); *Com-Tel v. DuKane*, 669 F.2d 404, 412 (6th Cir. 1982) (similar). As other circuits have explained, the same goes for circumstances in which the vertically related party "conceptualized" or "orchestrated" the conspiracy among horizontal entities—defendants still agreed to a horizontal conspiracy and "cannot escape the per se rule." *United States v. All Star Indus*., 962 F.2d 465, 473 (5th Cir. 1992). In *United States v. Apple*, for instance, the Second Circuit condemned a price-fixing agreement as per se unlawful even though the conspiracy was organized by a distributor (Apple) that did not compete with the other parties (book publishers) to the agreement. 791 F.3d 290 (2d Cir. 2015). In the words of the Fifth Circuit, if "there is a horizontal agreement between [competitors], there is no reason why others joining that conspiracy must be competitors." *United States v. MMR Corp. (LA)*, 907 F.2d 489, 498 (5th Cir. 1990).

**2.** Allegations in the complaints point to at least two characteristics that show that the alleged scheme falls within the class of per se unlawful price-fixing restraints.

*First*, the competing landlords have allegedly agreed to use RealPage and delegate aspects of pricing decisions to RealPage—which involves an algorithm analogous to a common pricing formula. Multifamily Compl. ¶¶ 6, 7, 30, 204, 230-232, 291; Student Compl. ¶¶ 61-93. Agreeing to use a common pricing formula is per se unlawful. *Socony-Vacuum*, 310 U.S. at 222. And the collective delegation of pricing decisions to a common entity or agent has been condemned as per se unlawful under Section 1. *See Citizen Pub. Co. v. United States*, 394 U.S. 131, 133-36 (1969)

(finding per se unlawful the delegation of key competitive decisions to joint entity); *Virginia Excelsior Mills, Inc v. FTC*, 256 F.2d 538, 540 (4th Cir. 1958) (finding per se unlawful the delegation of "all discretion in fixing prices" to a Board of Directors). It makes no difference that prices are fixed through joint use of an algorithm instead of by a person; price fixing by "express delegation, acquiescence, or understanding" is per se unlawful. *Masonite*, 316 U.S. at 274-75; *see Meyer*, 174 F. Supp. 3d at 824-26 (applying longstanding antitrust principles where prices are fixed by "algorithm"). Much like adopting a common pricing formula, acting in concert using a common pricing algorithm can exert an important "influence . . . on the starting point for prices," *Gelboim*, 823 F.3d at 776, which disrupts the decentralized price-setting mechanism in the market. *Cf. Cont'l Wall Paper Co. v. Lewis Voight & Sons Co*., 212 U.S. 227, 235-36, 249 (1909) (finding unlawful a "combination" among wall paper manufacturers due in part to the combination's ability to set list prices).

*Second*, the complaints allege that defendants acted in concert by knowingly sharing "competitively sensitive" and "non-public" pricing information with RealPage. *See supra* pp. 3-4. They did this on the mutual understanding that other landlords, who are "technically competitors," would do the same, allowing competitors to "work together" with the common goal of increasing prices and profits. *Id*. Although the "dissemination of price information is not itself a per se violation of the Sherman Act," *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 113 (1975), courts have recognized that competitors' exchanging of price information can play an important role in price fixing, *see*, *e.g.*, *Am. Column & Lumber Co. v. United States,* 257 U.S. 377, 411-12 (1921); *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 369 (3d Cir. 2004). Here, for example, RealPage allegedly generates specific pricing recommendations based on the competitors' confidential information, thus joining the competing landlords together in the pricing

process.  *Cf. Am. Column*, 257 U.S. at 411-12 (condemning information exchange whose "purpose and effect" were "to restrict competition" through "concerted action in curtailing production and in increasing prices").  It makes no difference that the confidential pricing information was shared through an algorithm rather than through "a guy named Bob."  Maureen K. Ohlhausen, *Should We Fear The Things That Go Beep In the Night? Some Initial Thoughts on the Intersection of Antitrust Law and Algorithmic Pricing*, Federal Trade Commission, at 10 (May 23, 2017), https://www.ftc.gov/system/files/documents/public_statements/1220893/ohlhausen_-_concurrences_5-23-17.pdf; *cf. United States v. Airline Tariff Pub. Co.*, 836 F. Supp. 9, 10 (D.D.C. 1993) (explaining, in a Tunney Act proceeding, that competitors fixed prices through "fare dissemination" software that enabled them to exchange confidential pricing information).

Importantly, the alleged scheme constitutes price fixing regardless of whether the competing landlords ever communicated with one another about prices.  As explained above, Section 1 encompasses purely "tacit agreements."  *Twombly*, 550 U.S. at 553; *see C.S. Sewell*, 2018 WL 6591429, at *3 (same); *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654 (7th Cir. 2002) (stating that Section 1 is "broad enough" to "encompass a purely tacit agreement to fix prices").  Under *Interstate Circuit*, it suffices to show that RealPage proposed the price-fixing scheme to competing landlords, who were each aware that its competitors were also being invited to participate in the scheme, and the competitors adhered to it—generating a common understanding among the competitors that they would increase prices collectively by using RealPage.  *See Interstate Circuit*, 306 U.S. at 226-227; *see also Moody*, 787 F. App'x at 870 (quoting *Interstate Circuit*).

Defendants lodge two primary objections to the classification of their arrangement as price fixing.  Both rest on a misunderstanding of the law, the alleged facts, or both.

21

*First*, defendants claim that the complaints must be dismissed because RealPage *recommends*, rather than mandates, certain prices. Multifamily Mot. 24-25; Student Mot. 21. But the complaints allege that RealPage exerts pressure to enforce its recommendations and landlords have outsourced pricing decisions to RealPage. *See supra* pp. 2-4. Even putting these factual allegations aside, however, courts have often applied the per se rule even though the fixed prices were non-mandatory. For instance, fixing advertised list prices is per se unlawful, even if firms are free to, and do, charge lower prices to customers. *See Flat Glass*, 385 F.3d 350 at 362-63 ("An agreement to fix list prices is . . . a per se violation of the Sherman Act even if most or for that matter all transactions occurred at lower prices."). The Supreme Court has likewise condemned as price fixing a county bar association's "suggested" "minimum-fee schedule" for lawyers that was enforced by discipline from the State Bar. *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 776, 782-83 (1975); *see also Norfolk Monument Co. v. Woodlawn Mem. Gardens*, 394 U.S. 700, 702-03 (1969) (describing pamphlet containing "suggested standards of fair and reasonable regulations which the [other conspirators] would be advised to adopt" as evidence of a price-fixing conspiracy).

In each of these cases, the challenged price-fixing scheme disrupted the competitive process. It is not necessary for liability that the scheme succeed in raising prices. *See Socony-Vacuum*, 310 U.S. at 224. So long as the evidence shows a mutual understanding among the competing landlords to use RealPage's prices as a starting point, the scheme is per se unlawful under Section 1.

*Second*, defendants argue that their conduct is not price fixing and hence the per se rule cannot apply because "[c]ourts have little to no experience evaluating whether use of revenue management software is unlawful under Section 1." Multifamily Mot. 28; Student Mot. 24. But

22

a defendant cannot "shield it[self] from the consequences" of organizing a price-fixing cartel merely because it organizes the cartel through disseminating a software program. Indeed, courts are not permitted to "examine the economic justification of . . . particular application[s] of the per se rule against price fixing." *Maricopa*, 457 U.S. at 349 n.19.

Judicial experience is relevant only in determining whether to adopt "a *new* per se rule"—not in deciding whether to apply an *established* per se rule. *Maricopa*, 457 U.S. at 349 & n.19 (emphasis added); *see id.* at 351 (explaining that the per se rule need not "be rejustified for every industry"); *United States v. Andreas*, 216 F.3d 645, 667 (7th Cir. 2000). There is no more established per se rule in antitrust than the per se rule against horizontal price fixing. Since the alleged price-fixing scheme falls within that established category, the per se rule applies.

## <u>CONCLUSION</u>

The law prohibiting horizontal price fixing applies with full force to schemes involving pricing algorithms. The motions to dismiss should be denied.

Respectfully submitted,

JONATHAN S. KANTER
*Assistant Attorney General*

DOHA G. MEKKI
*Principal Deputy Assistant Attorney General*

MAGGIE GOODLANDER
*Deputy Assistant Attorney General*

ANDREW J. FORMAN
*Deputy Assistant Attorney General*

DAVID B. LAWRENCE
*Policy Director*

JACOBUS VAN DER VEN
*Counsel to the Assistant Attorney General*

DANIEL E. HAAR
NICKOLAI G. LEVIN
STRATTON C. STRAND

YIXI (CECILIA) CHENG
*Attorneys*

*/s/ Yixi (Cecilia) Cheng*
U.S. Department of Justice
Antitrust Division
950 Pennsylvania Ave NW, #3224
Washington, DC 20530
Telephone: 202-705-8342
Email: yixi.cheng@usdoj.gov

*Counsel for the United States of America*

Dated: November 15, 2023

HENRY C. LEVENTIS
*United States Attorney*
Middle District of Tennessee

*/s/ Michael C. Tackeff*
Michael C. Tackeff
MICHAEL C. TACKEFF, B.P.R. #036953
*Assistant United States Attorney*
719 Church Street, Suite 3300
Nashville, TN 37203
Telephone: (615) 736-5151
Email: Michael.Tackeff@usdoj.gov

24

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document, which was filed with the Court through the CM/ECF system, will be sent electronically to all registered participants.

Dated: November 15, 2023
*/s/ Yixi (Cecilia) Cheng*
YIXI (CECILIA) CHENG